IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CROWN CASTLE FIBER LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO: _____ |
| CITY OF PASADENA, | § § § | |
| Defendant. | § | |

**ORIGINAL COMPLAINT AND APPLICATION FOR INJUNCTIVE RELIEF**

Crown Castle Fiber LLC files this Original Complaint against the City of Pasadena (the "City," or "Pasadena"), seeking declaratory and injunctive relief, and in support thereof, respectfully shows as follows:

**PARTIES**

1. Plaintiff Crown Castle Fiber LLC (f/k/a Crown Castle NG Central LLC) ("Crown Castle") is a New York limited liability company having its principal place of business at 1220 Augusta Drive, Suite 600, Houston, Texas 77057.

2. Defendant City of Pasadena is a home-rule municipality situated in Harris County, Texas.

**JURISDICTION AND VENUE**

3. This Court has jurisdiction over this action under Section 1331 of Title 28 of the United States Code because this is a civil action arising under Chapter 5 of Title 47 of the United States Code. This Court has authority to provide declaratory relief. 28 U.S.C. § 2201(a). This Court also has supplemental jurisdiction over Crown Castle's Texas law claims because the

1

claims are so related to Crown Castle's claims under federal law that they form part of the same case or controversy under Article III of the United States Constitution. 28 U.S.C. § 1367.

4. Venue is proper in this district because a substantial part of the events giving rise to the claims occurred in this district. 28 U.S.C. § 1391(b).

## NATURE OF ACTION

5. Crown Castle provides next-generation telecommunications services through Distributed Antenna Systems ("DASs"). These systems are a critical component in the development of what are commonly known as 5G networks, and they convert signals between radio frequency (*i.e.*, wireless) format and optical format and transmit them along fiber-optic cables ("fiber"). They are much smaller in size than traditional cell towers and are placed more densely in a network area to improve coverage, facilitate the 5G connection to consumers' devices, and provide greater bandwidth for consumers' devices to connect to a provider's network. This case concerns Crown Castle's right to place its network and facilities in the public rights of way in the City of Pasadena.

6. The deployment of competitive telecommunications services and advanced technologies is in the public interest, and Congress and the Texas Legislature have adopted statutes granting telecommunications providers such as Crown Castle the right to deploy network nodes and limiting the authority of local governments to frustrate such deployment. Similarly, the FCC—in its role as an independent agency responsible for implementing federal communications laws and regulations—has taken steps to accomplish Congress's intent in adopting such laws. Federal and Texas law specifically provide Crown Castle and similar providers with rights to deploy DASs, which lawmakers recognize are necessary to provide next-generation services to consumers.

7. Under federal law, Section 253 of Title 47 of the United States Code prevents local entities from erecting legal barriers that prohibit or may have the effect of prohibiting the ability of an entity to provide telecommunications services.

8. Under state law, Chapter 284 of the Local Government Code provides network providers, among other rights, the right to construct network nodes and node support poles in a public right of way to provide telecommunications service. Loc. Gov't Code §284.101. Crown Castle is such a network provider.

9. Nonetheless, the City—under the guise of a design manual—implemented a restriction that requires network nodes and supporting poles in a public right of way to be located at least 300 feet away from all existing utility or other node support poles in the public right of way. Like most densely populated areas across the country, Pasadena's rights of way are occupied by many utility poles providing electric, telephone, cable and telecommunications services to residents and businesses. Because of the number of utility poles currently occupying Pasadena's rights of way, there are very few locations that are actually available 300 feet away from each of these existing poles that are suitable for Crown Castle to install its network nodes and node support poles.

10. The City's spacing restriction is so onerous that it effectively prohibits Crown Castle from deploying a DAS network in the City because the spacing requirement eliminates the necessary node locations. The spacing restriction materially inhibits the deployment of the network and thereby effectively prohibits Crown Castle from providing telecommunications services in violation of federal law and Chapter 284 of the Texas Local Government Code. The spacing restriction is, therefore, preempted and unenforceable. This suit seeks declaratory and injunctive relief to remedy these violations of state and federal law.

## FACTS

### *Nature of Crown Castle's Business*

11. Crown Castle owns various telecommunications network facilities, and its service consists of providing transport of Crown Castle's customers' signals (both voice and data) between points designated by the customer. This type of transportation service is referred to as "switched access service."

12. One of Crown Castle's typical customers is a provider of retail wireless telecommunications services, also known as a commercial mobile radio services provider, cellular provider, or personal communications services provider (collectively hereafter "wireless services provider"). Through these providers, Crown Castle provides services to the general public on a wholesale level. Because numerous wireless carriers serve the areas in which Crown Castle develops DAS networks, the network is designed so that multiple carriers can use it. This spreads the benefits of Crown Castle's DAS networks as much as possible through the community and to its consumers.

13. Crown Castle provides its wireless services through network "nodes" and fiber. The fiber allows Crown Castle to transport its customers' signals to the point designated by the customer. The fiber ends at a network node, where equipment translates the customer's communications signal between the optical format and the customer's format.

14. The typical node in Crown Castle's network involves fiber, equipment to send and receive optical signals, electronics to convert optical signals to radio frequency signals (and vice versa), and other associated equipment, such as a small antenna and power supply. In some cases, all the equipment is mounted on a node support pole, and in other cases, the pole may not be able to bear the weight of all the equipment, requiring some of the equipment to be located in

a cabinet on the ground next to the pole. The latter of these arrangements are referred to as network nodes with "ground furniture."

15. After a radio frequency signal arrives at a node, the signal is translated into an optical format and transported through Crown Castle's fiber network to a distant point that is typically (but not always) an aggregation point called a "Hub." The Hub is a central location that contains such equipment as routers, switches, and signal conversion equipment. The Hub is typically installed in a building located on private property. At the Hub, Crown Castle transmits the communication signal to its customer.

16. This combination of nodes, fiber, equipment, and the Hub is generally referred to collectively as a DAS network. While a DAS network contains substantial equipment, most of the equipment installation is not at issue here because it will either be buried or not installed in the public right of way. Rather, this case involves only the portion of the DAS network that is the network node attached to the pole and installed in the public right-of-way, as seen below.



Network node with new node support pole in Pasadena, Texas. This is one of four nodes that was approved by the City in 2019 and installed in its planned location.

5

The development of DAS networks and installation of network nodes, such as the example above, are critical for the roll-out of what is commonly referred to as 5G wireless. 5G wireless is transformational technology because it provides increased bandwidth, allows more devices to be connected to the network at the same time, and is exceptionally fast compared to existing 4G technology. While 5G is exceptionally fast, it transmits data over shorter distances than 4G technology. Accordingly, wireless service providers must use DAS networks with smaller network nodes deployed at more locations, shrinking the distance between consumers' devices and the network. For that reason, DAS network nodes are sometimes referred to as "small cells."

17. Small cells are designed to off-load capacity from cell towers. The location of these nodes is critical because they are spaced in such a way that the hand-off of the signal from node to node happens smoothly, without the user experiencing a dropped call or lapse in data. Coverage between each node can vary, but it is typically limited to 700 feet. Each node is strategically placed to meet specific service and coverage objectives. As seen below, a few strategically placed small cells in a given cell tower's range dramatically enhances a customer's wireless experience and enables the use of 5G wireless in the area.



Traditional 4G tower coverage and capacity enhanced by seven small cells.

18. In order to construct DAS networks, however, Crown Castle must have access to the public rights of way in which to place its network nodes and related equipment.

*Federal and State law providing Crown Castle access to the public rights of way*

19. Federal law has long governed and encouraged the expansion of wireless communications. Such encouragement is found in a statute key to this lawsuit: Section 253 of the Telecommunications Act of 1996 (the "Act"). Titled, "Removal of Barriers to Entry," Section 253 reflects Congress's intent to encourage the expansion of telecommunication services. 47 U.S.C. § 253. Section 253(a) provides that "[n]o state or local statute or regulation . . . may prohibit or have the effect of prohibiting . . . telecommunications service." *Id.*

20. Although Congress passed the Act in the dawn of the cellular era, the FCC—charged with interpreting and enforcing the Act—has decided several cases and issued several key orders incrementally developing the application of the Act to small cell network nodes. It is black letter law that a local statute or ordinance is preempted not just when it expressly prohibits services, but also when it effectively prohibits services by "materially inhibit[ing]" the provision of services. *California Payphone Association*, 122 FCC Rcd. 14191, 14210 (1997). In 2018, the FCC issued an order commonly referred to as the Small Cell Order. *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*, 33 FCC Rcd. 9088 (2018) (hereafter "Small Cell Order"). The Small Cell Order interprets the Act and its application to the installation of network nodes, and it spells out the limits on local governments' authority to regulate wireless providers' installations.

21. The Act's limitation relevant to this case is its preemption of the City's local minimum spacing requirement. Generally, a minimum spacing requirement is a local ordinance that requires infrastructure to be installed a minimum distance away from other infrastructure

7

deployments. *E.g.*, Small Cell Order, ¶ 87. But a locality cannot use an unreasonable minimum spacing requirement to materially inhibit the provision of telecommunications services. Rather, the FCC noted that "a minimum spacing requirement that has the effect of materially inhibiting wireless services would be considered an effective prohibition of service," and therefore, a violation of Section 253 of the Act. *Id.*

22. Texas, too, has recently passed legislation to bring its telecommunications laws into the twenty-first century. Effective September 1, 2017, Texas enacted Chapter 284 of the Local Government Code, governing the deployment of network nodes in the public rights of way. The Texas legislature found that "network nodes are instrumental to increasing access to advanced technology and information for the citizens of this state and thereby further an important public policy of having reliable wireless networks and services." Tex. Loc. Gov't Code § 284.001(a)(1). The legislature further determined that "it is reasonable and necessary to allow access to the public right-of-way for the purposes of deploying network nodes." *Id.* at § 284.001(a)(10). It follows that "expeditious processes and reasonable and non-discriminatory terms, conditions, and compensation for use of the public right-of-way for network node deployments are essential to state-of-the-art wireless services." *Id.* at § 284.001(a)(5). Thus, Chapter 284 places additional reasonable requirements and limitations on Texas localities seeking to regulate the installation of network nodes.

23. Chapter 284 expressly provides that a network provider, such as Crown Castle, is authorized to "construct, modify, maintain, operate, relocate, and remove a network node or node support pole." *Id.* at § 284.101. Chapter 284 also contains two key limitations on Texas municipalities: (1) "except as provided by this Chapter [284], a municipality may not prohibit, regulate, or charge for the installation or collocation of network nodes in a public right-of-way;"

8

(*Id.* at § 284.151(a)); and (2) [a] municipality in the exercise of its "administrative and regulatory authority related to the management of and access to the public right-of-way, must be competitively neutral with regard to other users of the public right-of-way." *Id.* at § 284.110. Simply put, the City cannot prohibit Crown Castle from deploying network nodes in the public right of way, nor can it regulate such instances except as provided for in Chapter 284. And in attempting to enforce any regulatory requirements on the installation of network nodes, a municipality cannot discriminate against a network provider installing a network node as compared to any other user that has access to the public right of way, including but not limited to utility, cable, and traditional telephone service providers.

24. As described below, however, the City of Pasadena has violated both federal and Texas law. First, the spacing requirement adopted by the City materially inhibits the deployment of Crown Castle's DAS network, and therefore, constitutes an effective prohibition under 47 U.S.C. § 253. Second, the spacing requirement adopted by the City is inconsistent with the regulatory requirements of Chapter 284 and discriminatory compared to requirements for other users of the right of way. The City's spacing requirement, therefore, violates Chapter 284 for both reasons.

### *Crown Castle's Proposed DAS Network in the City of Pasadena*

25. Crown Castle operates approximately 80,000 miles of fiber and has approximately 70,000 nodes installed or under contract across the country. Since being approved to provide telecommunications services in Texas in 2005, Crown Castle has constructed DAS networks across Texas. These networks collectively include approximately 2,000 nodes installed in 28 cities and include deployments in city, county, and state rights of way.

9

26. In late 2017—following the effective date of the Texas Small Cell Bill—Crown Castle sought to install a DAS network in the City of Pasadena. The proposed DAS network included 100 nodes to be placed in public rights of way, which would provide wireless services.

27. In the same period, the City Council adopted a small cell ordinance and a Design Manual for the Installation of Network Nodes and Node Support Poles ("Design Manual"). Among other provisions, the Design Manual contains a spacing requirement that is the focus of this Complaint. New support poles for Network Nodes must be spaced at least 300 feet away from existing utility poles or Node Support poles.[1] Design Manual, §§ 4(D)(1) & 5(B).

28. However, the City had not finalized the requisites for a complete permit application. Therefore, beginning in 2018 and continuing until mid-2019, Crown Castle had extensive discussions with the City's Director and Assistant Director of Public Works, Robin Green and Zafar Iqbal, regarding applications for the proposed DAS network. Finally, in mid-2019, the City settled on application requirements. Of the 100 nodes, the City determined 67 were in commercial areas where Crown Castle could proceed and requested that Crown Castle submit the 67 applications in three batches.

29. In June 2019, Crown Castle submitted the first batch of 22 applications, all of which were Network Nodes on new Node Support Poles. The City approved only four of them and denied 16 on the basis that the site locations violated the Design Manual's 300-foot spacing requirement.[2]

---

[1] Network Node and Node Support Pole are defined terms in the Design Manual and encompass Crown Castle's equipment for its proposed DAS network in the City.
[2] The other locations were denied based on other City restrictions. Crown Castle is not challenging those other restrictions today.

30. Following the City's denial of 16 out of 22 applications because the proposed network node locations violated the 300-foot spacing requirement, Crown Castle internally reviewed the remaining 45 proposed locations. After its internal review, Crown Castle found that all 45 proposed locations to be submitted would violate the Design Manual's 300-foot spacing requirement. As a direct result of the City's 300-foot spacing requirements, Crown Castle cannot construct a DAS network in the City because it cannot construct the necessary nodes without violating the Design Manual. The specific location and spacing of nodes are critical to the design of a DAS network.

31. There is a current and on-going dispute between the City and Crown Castle regarding Crown Castle's legal rights under Section 253 of the Act and Chapter 284 of the Local Government Code. The City's regulations are materially inhibiting Crown Castle from providing telecommunications services under federal law. And the City is prohibiting Crown Castle from installing network nodes in the public right of way in violation of Texas law. Finally, because the 300-foot spacing requirement in the Design Manual is only applicable to the installation of new Network Nodes, the City is discriminating against network providers in violation of Texas law.

## COUNT I

### (Violation of 47 U.S.C. § 253)

32. Crown Castle incorporates the foregoing paragraphs as if set forth fully herein.

33. Section 253(a) of Title 47 of the United States Code provides, "[n]o state or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."

34. Crown Castle and its customers seek to provide interstate and intrastate telecommunications services in the City of Pasadena.

35. The Pasadena City Council adopted a Design Manual that requires that new Node Support Poles must be at least 300 feet away from existing utility poles or Node Support poles. Design Manual, §§ 4(D)(1) & 5(B). This requirement precludes the installation of 61 of the 67 commercial Network Node locations in Crown Castle's proposed DAS Network in the City. Accordingly, the 300-foot spacing requirement is unreasonable and materially inhibits Crown Castle from providing telecommunications services and has the effect of prohibiting Crown Castle's ability to provide telecommunications services.

*Declaratory Relief*

36. An actual controversy exists between Crown Castle and the City regarding Crown Castle's right to construct network nodes in the public rights of way.

37. Crown Castle seeks a declaration that the City may not require that Crown Castle's network nodes in the public rights of way be located more than 300 feet away from an existing utility or node support pole because such a requirement has the effect of prohibiting Crown Castle from providing telecommunications services. Although the City may regulate the use of the public rights of way and may require fair and reasonable compensation, a requirement that materially inhibits Crown Castle from providing telecommunications services constitutes an effective prohibition of Crown Castle from providing telecommunications services and is preempted by federal law. 47 U.S.C. § 253(a).

38. This Court has the authority to issue such a declaration. 28 U.S.C. § 2201.

*Injunctive Relief*

39. The City's 300-foot spacing requirement violates Section 253(a) of Title 47 because the requirement materially inhibits Crown Castle from providing telecommunications services and has the effect of prohibiting Crown Castle's ability to provide telecommunications services.

40. If Crown Castle is effectively prohibited from providing telecommunications services, it will suffer irreparable injury. Crown Castle will be continuously deprived of its statutory rights to provide telecommunications services. The loss of Crown Castle's federal statutory rights cannot be compensated by any monetary standard. Indeed, the Fifth Circuit has long held that telecommunications providers such as Crown Castle do not have a monetary remedy; Crown Castle's only relief is injunctive relief to enforce preemption of the City's 300-foot spacing requirement by the Act through declaratory and injunctive relief.

41. This threatened injury to Crown Castle outweighs any damage that an injunction might cause to the City. Indeed, an injunction requiring the City to comply with its obligations under federal law would not damage the City.

42. An injunction requiring the City to comply with federal law will not disserve the public interest. On the contrary, the public will benefit from the Court's enforcement of the balance struck by Congress in the Act and the telecommunications services to be provided by Crown Castle.

43. Accordingly, Crown Castle seeks an injunction prohibiting the City of Pasadena from enforcing Sections 4(D)(1) & 5(B) of the Design Manual.

## COUNT II

### (Violation of Texas Local Government Code Chapter 284)

44. Crown Castle incorporates the foregoing paragraphs as if set forth fully herein.

45. Section 284.001(a) of the Local Government Code provides:

The legislature finds that (a):

(1) Network nodes are instrumental to increasing access to advanced technology and information for the citizens of this state and thereby further an important public policy of having reliable wireless networks and services. . . .

(5) Expeditious processes and reasonable and non-discriminatory terms, conditions, and compensation for use of the public right-of-way for network node deployments are essential to state-of-the-art wireless services. . . .

(10) It is reasonable and necessary to allow access to the public right-of-way for the purposes of deploying network nodes.

TEX. LOCAL GOV'T CODE § 284.001(a). In addition:

In order to safeguard the health, safety, and welfare of the public, it is the policy of this state to promote the adoption of and encourage competition in the provision of wireless services by reducing the barriers to entry for providers of services so that the number and types of services offered by providers continue to increase through competition.

TEX. LOCAL GOV'T CODE § 284.001(b).

46. Chapter 284 expressly provides that a network provider, such as Crown Castle, is authorized to "construct, modify, maintain, operate, relocate, and remove a network node or node support pole." *Id.* at § 284.101. Chapter 284 also contains two key limitations on Texas municipalities: (1) "except as provided by this Chapter [284], a municipality may not prohibit, regulate, or charge for the installation or collocation of network nodes in a public right-of-way;" (*Id.* at § 284.151(a)); and (2) A municipality in the exercise of its "administrative and regulatory

14

authority related to the management of and access to the public right-of-way, must be competitively neutral with regard to other users of the public right of way." *Id.* at § 284.110.

47.     Under the statute, a "network provider" means "a wireless service provider" or "a person that…builds or installs on behalf of a wireless service provider." Tex. Loc. Gov't Code 284.002(13). Crown Castle builds and installs telecommunications infrastructure on behalf of its wireless service provider customers. Crown Castle's customers are wireless service providers because they provide "service, using licensed or unlicensed wireless spectrum, including the use of Wi-Fi, whether at a fixed location or mobile…to the public using a network node." *Id.* at 284.002(24) & (25).  Pursuant to these definitions, Crown Castle is a Network Provider under Chapter 284.

48.     Accordingly, Crown Castle may "construct, modify, maintain, operate, relocate, and remove a network node or node support pole." TEX. LOCAL GOV'T CODE § 284.101(a).

49.     The City's refusal to allow Crown Castle to deploy 61 of 67 Network Nodes of its DAS network in the public rights of way of the City on the basis of the City's 300-foot spacing requirement for new Node Support Poles violates Chapter 284 of the Local Government Code.

   *Declaratory Relief*

50.     An actual controversy exists between Crown Castle and the City regarding Crown Castle's right to deploy its DAS network and construct new Node Support Poles in the public right of way.  No further factual development is necessary, and the parties' legal dispute regarding the discriminatory nature of the 300-foot spacing requirement for new network node support poles is ripe for adjudication.

51.     Crown Castle seeks a declaration that the City may not prevent Crown Castle from constructing new network support poles as part of Crown's provision of wireless services

on the City's requirement that those network support poles must be at least 300 feet away from existing utility poles or Node Support poles, as specified in Sections 4(D)(1) & 5(B) of the Design Manual.

52. This Court has the authority to issue such a declaration.  28 U.S.C. § 2201.

*Injunctive Relief*

53. The City's 300-foot spacing requirement in Section 4(D)(1) & 5(B) of the Design Manual violates Chapter 284 of the Local Government Code, as described above.

54. If Crown Castle is not permitted to construct its Network Nodes in the public rights of way, it will be unable to provide telecommunications service and will suffer irreparable injury.

55. This threatened injury to Crown Castle outweighs any damage that an injunction might cause to the City.  Indeed, an injunction requiring the City to comply with its obligations under state law would not damage the City.

56. An injunction requiring the City to comply with state law will not disserve the public interest.  On the contrary, the public will benefit from the Court's enforcement of the policy announced by the legislature and the wireless services provided by Crown Castle.

57. Accordingly, Crown Castle seeks an injunction for this additional reason, prohibiting the City of Pasadena from enforcing Section 4(D)(1) & 5(B) of the Design Manual.

**PRAYER**

The City's refusal to allow Crown Castle to install the proposed Network Nodes in Crown Castle's proposed DAS network in the public rights of way based on Section 4(D)(1) & 5(B) of the Design Manual violates both state and federal law.  Accordingly, for the foregoing reasons, Crown Castle seeks (1) a declaration that Sections 4(D)(1) & 5(B) of the Design Manual

are unenforceable, and (2) an injunction forbidding the City of Pasadena from enforcing Sections 4(D)(1) & 5(B) of the Design Manual.

Crown Castle respectfully requests all such other relief, in law or in equity, to which it may show itself to be entitled.

September 30, 2020

Respectfully submitted,

**BECK REDDEN LLP**

By: */s/ Jeff M. Golub*
Jeff M. Golub
Texas State Bar No. 00793823
Federal I.D. No. 21606
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720
jgolub@beckredden.com

**ATTORNEY-IN-CHARGE FOR PLAINTIFF**

**OF COUNSEL**

Joel T. Towner
Texas State Bar No. 24083978
Federal I.D. No. 2442971
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720
jtowner@beckredden.com