United States District Court
Southern District of Texas
**ENTERED**
August 02, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CROWN CASTLE FIBER LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. H-20-3369 |
| | § | |
| CITY OF PASADENA, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Pending before the Court are Plaintiff Crown Castle Fiber LLC's Motion for
Judgment on the Pleadings (Document No. 123), Plaintiff Crown Castle Fiber
LLC's Motion for Summary Judgment (Document No. 124), Defendant City of
Pasadena's Motion to Dismiss and for Final Summary Judgment (Document No.
128), Defendant City of Pasadena's Combined Opposition to Plaintiff's Motion for
Judgment on the Pleadings and the City's Opposed Motion for Leave to File a
Responsive Pleading (Document No. 134). Having considered the motions,
submissions, and applicable law, the Court determines Plaintiff's motion for
judgment on the pleadings should be denied, Defendant's motion to dismiss should
be denied, Defendant's motion for summary judgment should be denied,
Defendant's motion for leave should be denied, and Plaintiff's motion for
summary judgment should be granted.

## I. BACKGROUND

This case involves the installation of wireless telecommunication services. Plaintiff Crown Castle Fiber LLC ("Crown Castle") provides next-generation telecommunication services through Distributed Antenna Systems ("DAS") that are critical to development of 5G networks. In order to provide these services, Crown Castle must install DAS networks, which consist of nodes, fiber, conversion equipment, and an aggregation point from which the communication signal is transmitted. In order to install parts of the DAS networks, Crown Castle alleges it must have access to the public rights-of-way. In late 2017, Crown Castle alleges it sought to install a DAS network in Defendant City of Pasadena, Texas (the "City"). Around this time, the Texas Legislature enacted Chapter 284 of the Texas Local Government Code which regulates the construction and deployment of wireless network nodes in public rights-of-way across Texas. Tex. Loc. Gov't Code § 284 *et seq*. In response to this legislation, the City adopted ordinances in response to governing the installation of small cell nodes and node support poles in the City's the public rights-of-way (the "Design Manual"). The Design Manual contains: (1) a spacing requirement which significantly limits the locations where it may install the nodes, despite the fact the DAS network requires the nodes to be in specific locations to be functional; and (2) an underground requirement that forces

the nodes and the accompanying radio equipment to be buried in residential areas, which Crown Castle contends is not technically feasible.

Based on the foregoing, on September 30, 2020, Crown Castle filed this lawsuit, asserting preemption claims against the City for violations a provision of the Telecommunications Act of 1996 (the "Act"), 47 U.S.C. § 253(a) ("Section 253(a)"), and the Texas Local Government Code, Tex. Loc. Gov't Code § 284 *et seq.*, based on Sections 4.C.3, 4.C.4, 4.E.1, and 5.B of the Design Manual. Crown Castle also seeks declaratory and injunctive relief allowing it to install the nodes in the public rights-of-way in the City. On August 19, 2021, the Court granted the motion for leave to amend, and Crown Castle amended its complaint. On April 11, 2022, Crown Castle moved for judgment on the pleadings and for summary judgment. On April 11, 2022, the City moved to dismiss Crown Castle's claims and for summary judgment. On May 2, 2022, the City moved for leave to file its answer to Crown Castle's amended complaint.

## II.  STANDARD OF REVIEW

*A.     Rule 12(b)(1) Standard*

Federal Rule of Civil Procedure 12(b)(1) requires that a court dismiss a claim if the court does not have subject matter jurisdiction over the dispute. Fed. R. Civ. P. 12(b)(1). A motion for lack of subject matter jurisdiction under Rule 12(b)(1) must be considered before any motion on the merits because subject

matter jurisdiction is required to determine the validity of any claim. *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994). "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Id.* Unlike a court considering a Rule 12(b)(6) or Rule 56 motion, district courts have a "unique power . . . to make factual findings which are decisive of [subject matter] jurisdiction" when considering a motion under Rule 12(b)(1) that raises questions of fact relevant to subject matter jurisdiction. *Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. 1981).

### B. Rule 12(c) Standard

Motions made pursuant to Federal Rule of Civil Procedure 12(c) are "designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (citations and internal quotation marks omitted). "A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule

12(b)(6)." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). Therefore, like a motion under Rule 12(b)(6), Rule 12(c) allows dismissal if a plaintiff fails to state a claim upon which relief may be granted. *Id.* Under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' it demands more than 'labels and conclusions.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "[A] formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555).

In deciding a Rule 12(c) motion, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the [non-movant].' " *In re Katrina Canal Breeches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). As with a Rule 12(b)(6) motion, the Court is permitted to consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters which a court may take judicial notice." *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011). The motion "should be granted if there is no issue of material fact and if the pleadings show that the moving party is entitled to judgment as a matter of law." *Van Duzer v. U.S. Bank Nat'l Ass'n*, 995 F. Supp. 2d

673, 683 (S.D. Tex. 2014) (Lake, J.) (citing *Greenberg v. Gen. Mills Fun Grp., Inc.*, 478 F.2d 254, 256 (5th Cir. 1973)).

C.   *Summary Judgment*

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the evidence in a light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). Initially, the movant bears the burden of presenting the basis for the motion and the elements of the causes of action upon which the nonmovant will be unable to establish a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to come forward with specific facts showing there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted).

But the nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary. If a reasonable jury could not return a verdict for the nonmoving party, then summary judgment is appropriate. *Liberty Lobby, Inc.*, 477 U.S. at 248. The nonmovant's

burden cannot be satisfied by "conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.' " *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). Uncorroborated self-serving testimony cannot prevent summary judgment, especially if the overwhelming documentary evidence supports the opposite scenario. *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 294 (5th Cir. 2004). Furthermore, it is not the function of the Court to search the record on the nonmovant's behalf for evidence which may raise a fact issue. *Topalian v. Ehrman*, 954 F.2d 1125, 1137 n.30 (5th Cir. 1992). Therefore, "[a]lthough we consider the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmovant, the nonmoving party may not rest on the mere allegations or denials of its pleadings, but must respond by setting forth specific facts indicating a genuine issue for trial." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 735 (5th Cir. 2000).

## III.  LAW & ANALYSIS

The City contends: (1) the Court should grant its motion to dismiss because Crown Castle lacks standing to assert its claims; (2) the Court should grant its motion for leave to file an answer so that it may assert its affirmative defenses; and (3) the Court should deny Crown Castle's motion for summary judgment as they fail to meet the basic elements of its claims and grant its motion for summary

judgment because the Design Manual is protected by the Act's safe harbor provision. Crown Castle contends: (1) the Court should sustain its evidentiary objections to the City's summary judgment evidence; (2) it is entitled to judgment on the pleadings because the City failed to file an answer, and thus has admitted to the allegations in its amended complaint; and (3) it is entitled to summary judgment on its preemption claims because the Design Manual's spacing and underground requirements materially inhibit its ability to provide telecommunications service. The Court first turns to the City's motion to dismiss, before evaluating the City's motion for leave and the parties' cross-motions for summary judgment.

## A.   The City's Motion to Dismiss

The City contends Crown Castle's claims should be dismissed for lack of subject matter jurisdiction because the Act does not provide a private right of action. Crown Castle contends the precedent in this circuit holds a "plaintiff seeking relief from a state regulation on the ground of preemption by a federal statute 'presents a federal question which federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.' " *Sw. Bell Tel. LP v. City of Houston*, 529 F.3d 257, 262 (5th Cir. 2008) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983)). Here, Crown Castle seeks declaratory and injunctive relief, in part, on the basis the Design Manual's spacing and underground requirements are preempted

by federal law (i.e., the Act). Because the basis of one of Crown Castle's claims is that the Design Manual is preempted by federal, the Court finds federal subject matter jurisdiction exists. Therefore, having considered the motion, submissions, and appliable law, the Court determines the City's motion to dismiss for lack of subject matter jurisdiction should be denied. The Court now turns to the City's motion for leave to file an answer.

B.   *The City's Motion for Leave*

The City contends it should now be allowed to file an answer to assert affirmative defenses upon which it relies in its pending motion for summary judgment, roughly nine months after the deadline to do so elapsed, arguing good cause exists under both Federal Rules of Civil Procedure 6 and 16 to allow the late filing. Crown Castle contends the City fails to meet the good cause standard under either Rule 6 or 16 and allowing the City to file an answer would be highly prejudicial at this stage of the litigation. The Court first addresses the City's arguments under Rule 6, before turning to its argument under Rule 16.

1.   *Rule 6*

Under Rule 6(b), a court may extend a deadline after such deadline has elapsed if the movant establishes good cause and "excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). The factors relevant to determining "excusable neglect" are: (1) "the possibility of prejudice to the other parties;" (2) "the length of the applicant's delay

and its impact on the proceeding;" (3) "the reason for the delay and whether it was within the control of the movant;" and (4) "whether the movant has acted in good faith." *Salts v. Epps*, 676 F.3d 468, 474 (5th Cir. 2012) (citing 4B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1165 (4th ed. 2022)).

With respect to the first factor dealing with the possibility of prejudice, the City contends: (1) it has responded to Crown Castle's allegations and generally denied its claims;[1] (2) Crown Castle had the opportunity to conduct discovery on the City's defenses;[2] (3) the City's failure to file an answer could not have prejudiced Crown Castle;[3] and (4) Crown Castle, "despite knowing the City had not answered [Crown Castle's] amended complaint," "cannot in good faith contend the City's admitted oversight was anything more than harmless and nonprejudicial."[4] Conversely, Crown Castle contends it did not conduct discovery on the City's affirmative defenses because it had no way of knowing what those defenses were until the City first raised them in its motion for summary judgment.

---

[1] *City of Pasadena's Combined Opposition to Plaintiff's Motion for Judgment on the Pleadings and the City's Opposed Motion for Leave to File a Responsive Pleading*, Document No. 134 at 3 [hereinafter *Opposition and Motion for Leave*].

[2] *Opposition and Motion for Leave, supra* note 1 at 5.

[3] *Opposition and Motion for Leave, supra* note 1 at 5.

[4] *Opposition and Motion for Leave, supra* note 1 at 5–6.

Crown Castle further contends the defenses the City seeks to plead in its answer "inject[] new issues" and "impose[] new burdens" on Crown Castle after the close of discovery.[5] Indeed, it is unclear how Crown Castle had fair notice of the City's affirmative defenses as required by the Federal Rules of Civil Procedure prior to the City's filing of its motion for summary judgment on April 11, 2022. *See* Fed. R. Civ. P. 8(c). The purpose of Rule 8(c) is to prevent "unfair surprise" with respect to a defendant's affirmative defenses. *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999). To allow a defendant to raise an affirmative defense for the first time at the summary judgment stage, well after the close of discovery, is both antithetical to the very purpose of Rule 8's fair notice pleading requirements and highly prejudicial to the plaintiff. Thus, the Court finds the possibly of prejudice in allowing the City to file an answer asserting affirmative defenses is high. Therefore, this factor weighs against granting the City's motion for leave.

The second factor addresses the movant's length of delay in seeking leave and the impact on the proceedings. Here, on August 19, 2021, Crown Castle amended its complaint.[6] Therefore, the City had until September 2, 2021 to file its answer to the amended complaint. *See* Fed. R. Civ. P. 15(a)(3). It is undisputed the

---

[5] *Plaintiff's Response in Opposition to Defendant's Motion for Leave to File an Answer*, Document No. 145 at 7.

[6] *See Order*, Document No. 67.

City failed to do so. The City did not move for leave to file an answer until May 2, 2022, nine months later, and two months before the scheduled trial term. The Court finds the nine months between the City's deadline to file its answer and its motion for leave constitutes a significant delay and, if granted, would greatly impact the proceedings. Thus, this factor also weighs against granting the City's motion for leave.

The third factor relates to the City's reason for its delay and whether that reason was within its control. The City admits the reason for failing to timely answer the amended complaint was an "oversight,"[7] and an "inadvertent mistake" on the part of its counsel.[8] However, the City cannot invoke an equitable principle, like excusable neglect, to pardon its own lack of diligence. *See L.A. Pub. Ins. Adjusters, Inc. v. Nelson*, 17 F.4th 521, 527 (5th Cir. 2021) (quoting *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984)). Thus, the Court finds the City's lack of diligence is the cause for the delay which was wholly within the City's control. Therefore, the third factor also weighs against granting the City's motion.

---

[7] *Opposition and Motion for Leave*, *supra* note 1 at 6.

[8] *City of Pasadena's Reply in Support of its Motion for Leave to File a Pleading Responsive to Plaintiff's Amended Complaint*, Document No. 146 at 3.

The final factor addresses whether the City acted in good faith. The City contends its failure to timely answer was due to a mistake and was not a decision made in bad faith. There is no evidence indicating the City acted in bad faith by failing to timely answer Crown Castle's amended complaint. Thus, the Court finds the City did not act in bad faith by failing to timely answer and waiting nine months to move for leave to file an answer. Therefore, this factor weighs in favor of granting the City's motion for leave.

However, three out of the four factors weight in favor of denying the City's motion for leave. The only factor weighing in favor of granting the motion is the final factor, addressing whether the City acted in good faith. Since the majority of the factors weigh in favor denial, the Court finds the City fails to establish excusable neglect under Rule 6(b). *See Nelson*, 17 F.4th at 527. The Court now turns to whether Rule 16 provides an avenue for the City to file an answer.

### 2.   *Rule 16*

Additionally, Rule 16 allows a court to amend a scheduling order for good cause. Under Rule 16, four factors determine whether there is good cause: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *S & W Enters., LLC v.*

*SouthTrust Bank of Al., NA*, 315 F.3d 533, 535 (5th Cir. 2003) (quoting *Reliance Ins. Co. v. La. Land & Exploration Co.*, 110 F.3d 253, 257 (5th Cir. 1997)).

As to the first factor, as stated above, the City explains its failure to timely move for leave was based on an oversight by its counsel. However, mere oversight by counsel is an insufficient explanation for its failure to timely seek leave to file an answer. *See S & W Enters., LLC*, 315 F.3d at 535 (stating that "inadvertence" "is tantamount to no explanation at all"). Therefore, the Court finds the City's explanation for its failure to timely move for leave is insufficient. Thus, the first factor weighs against granting leave.

With respect to the second factor, the City contends the amendment allowing it to file an answer is important because without it the City waives the affirmative defense it asserts in its pending motion for summary judgment. Therefore, the Court finds the amendment here is important to the City's ability to raise affirmative defenses. Thus, this factor weighs in favor of granting leave to amend.

The third factor addresses the potential prejudice in allowing the amendment which, as discussed above, in this case is high. The potential for prejudice to Crown Castle is high should the Court grant the City leave to file its answer at this late date, as that answer would contain affirmative defenses heretofore unknown to Crown Castle. Further, the parties have already filed cross-motions for summary judgment—and included in the City's motion for summary judgment are at least

some of the affirmative defenses the City wishes to assert if granted leave to answer. However, Crown Castle has been deprived of the opportunity to conduct discovery related to these affirmative defenses due to the City's failure to timely answer and properly assert such defenses. Therefore, the Court finds there is a significant potential for prejudice to Crown Castle should it grant the City's motion for leave to amend. Thus, this factor also weighs against granting leave to amend.

The fourth factor address whether a continuance would cure any prejudice caused by allowing the amendment. This case is currently on the July/August 2022 trial term,[9] and both parties have pending motions for summary judgment. This case has been pending since September 2020 and there have been several continuances granted to date.[10] Given the age of this lawsuit, another continuance would only serve to amplify, not cure, Crown Castle's prejudice. Therefore, the Court finds a continuance is not available to cure the prejudice caused by granting the City's motion for leave.

Three of the four factors weigh against granting the City's motion to amend the scheduling order. Allowing amendment at this point would cause Crown Castle a high degree of prejudice, and a continuance would not be a practical means to

---

[9] *Order*, Document No. 114, at 1.

[10] *Order*, Document No. 67 (granting the City's July 27, 2021 motion for continuance); *Order*, Document No. 103 (granting in part the City's November 15, 2021 motion for continuance); *Order*, Document No. 114 (granting the City's February 10, 2022 motion for continuance).

cure this prejudice at this stage of the litigation. Thus, the Court finds the City fails to establish good cause to amend the scheduling order. Accordingly, the City's motion for leave is denied. The Court now turns to Crown Castle's evidentiary objections to the City's summary judgment evidence.

## C.   *Crown Castle's Evidentiary Objections*

Crown Castle objects to the City's Exhibits 3, 16, 17, and 18, contending: (1) Exhibits 3 and 18 are irrelevant; and (2) Exhibits 16 and 17 are inadmissible under *Daubert* and Rule 702 of the Federal Rules of Evidence.

### 1.   *Exhibit 3*

Crown Castle contends the Court should exclude certain portions of Exhibit 3, a deposition of a T-Mobile representative,[11] because they are irrelevant. Having reviewed Exhibit 3, the Court finds it could be reduced to an admissible form at trial. Therefore, the Court finds Crown Castle's evidentiary objections to Exhibit 3 should be overruled. Accordingly, Crown Castle's evidentiary objections to Exhibit 3 are overruled.

---

[11] Crown Castle and T-Mobile, who is not a party in this case, entered into an agreement under which Crown Castle would install a small cell network designed to assist densifying the coverage of T-Mobile's current cellular network. It was this agreement with prompted Crown Castle to attempt to install the small cell nodes and node support poles at issue in this case.

*2.    Exhibits 16 & 17*

Crown Castle contends Exhibit 16, an uncertified deposition, and Exhibit 17, unsworn reports, both from the City's expert Richard Comi are inadmissible under *Daubert* and Federal Rule of Evidence 702. Having reviewed Exhibits 16 and 17, the Court finds Exhibits 16 and 17 could be reduced to a form admissible at trial. Therefore, the Court finds Crown Castle's objections to Exhibits 16 and 17 should be overruled. Accordingly, Crown Castle's evidentiary objections to Exhibits 16 and 17 are overruled.

*3.    Exhibit 18*

Crown Castle contends Exhibit 18, the map of T-Mobile's network coverage from T-Mobile's website, is irrelevant. Having reviewed the network map, the Court finds it could be reduced to a form admissible at trial. Therefore, the Court finds Crown Castle's evidentiary objections to Exhibit 18 should be overruled. Accordingly, Crown Castle's evidentiary objections to Exhibit 18 are overruled.

*D.    Crown Castle's Motion for Summary Judgment*

Crown Castle contends it is entitled to summary judgment because Sections 4.C.3, 4.C.4, 4.E.1, and 5.B of the Design Manual: (1) violate Section 253(a) of the Act as they effectively prohibit Crown Castle from providing telecommunications services through these discriminatory regulations; and (2) violate Section 284 of the Texas Local Government Code as they impede the construction of small cell

node support poles which should be allowed as a matter of right and, further, subjects such technology to adverse treatment. The City contends: (1) the contested sections of the Design Manual are protected by the safe harbor provision in Section 253(c) of the Act (the "Safe Harbor Provision"); but even if they are not, (2) Crown Castle fails to establish basic elements of its claims, such as whether it actually provides telecommunications services as defined by the Act.

### 1.   47 U.S.C. § 253

Crown Castle contends the Design Manual is preempted by the Act because the spacing and underground requirements contained in the Design Manual effectively prohibit Crown Castle from providing telecommunications services. The City contends Crown Castle does not offer telecommunications services as defined in the Act, or alternatively, the Design Manual is sheltered by the Safe Harbor Provision—which Crown Castle contends is an affirmative defense that the City has waived. The Court addresses whether the City properly asserted it as an affirmative defense and the Safe Harbor Provision's applicability below. However, the Court first turns to the threshold question of whether Crown Castle offers telecommunication services as defined by the Act.

### a.   Telecommunications Services

The parties dispute whether Crown Castle provides telecommunications services as defined by the Act. Under the Act, "telecommunications services" are

defined as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. § 153(53). "Telecommunications" are defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." *Id.* § 153(50). A "telecommunications carrier" is "any provider of telecommunications services . . . [who] shall be treated as a common carrier." *Id.* § 153(51). Other courts have held providers of "telecommunications service" are equivalent to "common carriers," meaning a provider who "holds itself out indiscriminately." *Crown Castle NG E. Inc. v. Town of Greenburgh*, No. 12-CV-6157(CS), 2013 WL 3357169, at *15 (S.D.N.Y. July 3, 2013) (Seibel, J.) (citing *V.I. Tel. Corp. v. FCC*, 198 F.3d 921, 926 (D.C. Cir. 1999)). "A provider may be a common carrier even if its services are not practically available to the entire public; a specialized carrier whose service is of possible use to only a fraction of the population may nonetheless be a common carrier if [it] holds [itself] out to serve indifferently all potential users." *Id.* (quoting *Nat'l Ass'n of Regul. Util. Comm'n v. FCC (NARUC II)*, 525 F.2d 630, 642 (D.C. Cir. 1976)) (internal quotations omitted).

Crown Castle's services, which include the construction of wireless networks to provide telecommunications services, enable common carriers to

provide telecommunications services to the public.[12] Since Crown Castle's services enable common carriers, like T-Mobile in this case, to provide telecommunications services to the general public, the Court finds Crown Castle's services are available to "classes of users as to be effectively available directly to the public." Therefore, the Court finds Crown Castle provides telecommunications services as defined in the Act. Now the Court turns to whether the Safe Harbor Provision shelters the Design Manual from preemption.

### b.     *The Safe Harbor Provision*

The City contends the Design Manual falls within the protections of the Safe Harbor Provision. Crown Castle contends: (1) the City has waived any argument regarding the safe harbor provision because it is an affirmative defense which the City has not pleaded; and (2) even if the City has properly asserted such an affirmative defense, the Design Manual is not protected by the safe harbor provision. The Court first examines whether the City has waived its affirmative defenses, specifically the Safe Harbor Provision.

### i.     *Waiver*

Crown Castle contends the City has waived the right to assert any affirmative defenses, including the Safe Harbor Provision, because it failed to file

---

[12] *See Plaintiff Crown Castle Fiber LLC's Motion for Summary Judgment,* Document No. 124, Exhibit 5 (*T-Mobile-Crown Castle Small Cell Order Agreement*).

an answer. The City contends Crown Castle would not be prejudiced by its assertion of the Safe Harbor Provision as an affirmative defense, even though it failed to answer Crown Castle's complaint.

Generally, affirmative defenses must be raised in the first responsive pleading. Fed. R. Civ. P. 8(c). However, "[w]here the matter is raised in the trial court in a manner that does not result in unfair surprise . . . [a] technical failure to comply precisely with Rule 8(c) is not fatal." *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 577 (5th Cir. 2009) (quoting *Allied Chem. v. Mackay*, 695 F.2d 854, 855–56 (5th Cir. 1983)). Thus, "[a]n affirmative defense is not waived if the defendant 'raised the issue at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond.' " *Id.*

Here, the City has not answered the operative complaint and, thus, has failed to assert the Safe Harbor Provision as an affirmative defense. As discussed above, the City's failure to timely answer or otherwise raise the Safe Harbor Provision as an affirmative defense is highly prejudicial and constitutes unfair surprise to Crown Castle at this stage of the litigation. Thus, the Court finds the City did not raise its affirmative defenses at a "pragmatically sufficient" time and therefore has waived the Safe Harbor Provision as an affirmative defense. *See Pasco*, 566 F.3d at 577. But even if the City had timely raised the Safe Harbor Provision, it still would not apply in this instance.

ii.   *Applicability of the Safe Harbor Provision*

Crown Castle contends the Federal Communications Commission (the "FCC") issued an order that agrees with its reading of the Safe Harbor Provision, stating right-of-way regulations should be "competitively neutral and nondiscriminatory." The City contends: (1) the safe harbor provision clearly reserves the right of state and local governments to "manage the public rights-of-way," which is the purpose of the Design Manual; and (2) the clause "on a competitively neutral basis" only applies to the preceding clause regarding reasonable compensation under the last-antecedent canon.

The Safe Harbor Provision reads as follows:

> Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights of way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

47 U.S.C. § 253(c).

The scope of the Safe Harbor Provision's protection of aesthetic requirements or ordinances presents an issue of first impression in this circuit, as the current case law pertains mainly to the reasonableness of fees imposed for use of public rights-of-ways. *See, e.g.*, *Sw. Bell Tel. LP v. City of Houston*, 529 F.3d 257 (5th Cir. 2008) (finding ordinance imposing relocation costs on telecommunications owners to be "competitively neutral and nondiscriminatory").

22

However, the FCC recently issued an order offering guidance on the interpretation of the Safe Harbor Provision with respect to aesthetic requirements for small cell technology. There, the FCC concluded "[the Safe Harbor Provision] is properly constructed to suggest that Congress did not intend to permit states and localities to rely on their ownership of property within the [rights-of-way] as a pretext to advance regulatory objectives that prohibit or have the effect of prohibiting the provision of covered services . . . ." *In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*, 33 F.C.C. Rcd. 9088, 9138 (2018) (the "FCC Order").[13] The FCC Order concludes "that aesthetic requirements are not preempted if they are . . . reasonable, [and] . . . no more burdensome than those applied to other types of infrastructure deployments . . . ." *Id.* at 9132. The FCC also states "requirements . . . are reasonable [if] they are technically feasible and reasonably directed to avoiding or remedying the intangible public harm of unsightly or out-of-character are also permissible." *Id.* However, the FCC caveats this by reiterating those requirements which are more

---

[13] Under the Hobbs Act, the Court does not have jurisdiction to review the merits FCC Order and thus is bound by the FCC's prior ruling. 28 U.S.C. § 2342(1). However, the United States Court of Appeals for the Ninth Circuit, upon review of the consolidated challenges, affirmed in part and vacated in part the FCC Order. *See City of Portland v. United States*, 969 F.3d 1020 (9th Cir. 2020). The only relevant portion of the FCC Order that the Ninth Circuit vacated was the conclusion aesthetic requirements must be "objective." *Id.* at 1042. The parties do not argue whether or not the contested sections of the Design Manual are objective. Thus, the Court does not consider this portion of the FCC Order for the purposes of this Order.

burdensome on small node networks than other similar technologies would be impermissible as the "discriminatory application evidences [those] requirements are not, in fact, reasonable and directed at remedying the impact of wireless infrastructure deployment." *Id.*

Here, the two different aesthetic requirements at issuer are a spacing requirement and an underground requirement. The spacing requirement at issue prevents small cell node support poles from being constructed within 300 feet of existing utility poles in the public rights-of-way.[14] The underground requirement prevents small cell node equipment from being installed above ground in residential areas.[15] It is undisputed these requirements only apply to the construction of new small cell networks,[16] and not to either existing small node networks or any other utility that makes use of the public rights-of-ways. While all other telecommunications service providers or other utilities are subject to a less stringent standard, "[a] person may be required to place certain facilities within the

---

[14] *Plaintiff Crown Castle Fiber LLC's Motion for Summary Judgment*, Document No. 124, Exhibit 9 at 18, 21 (*Amended Design Manual*).

[15] *Plaintiff Crown Castle Fiber LLC's Motion for Summary Judgment*, Document No. 124, Exhibit 9 at 18 (*Amended Design Manual*).

[16] *Plaintiff Crown Castle Fiber LLC's Motion for Summary Judgment*, Document No. 124, Exhibit 9 at 3 ("This [Amended] Design Manual is for sighting and criteria for the installation of Wireless Facilities, including Micro Network Nodes, Network Nodes, Node support poles and related ground equipment being installed pursuant to Loc. Gov. Code, Chapter 284 [which encourages the construction of network nodes and node support poles].").

public rights-of-way underground according to applicable city requirements . . . unless the person makes a compelling demonstration that . . . this requirement is not reasonable, feasible or equally applicable to other similar users of the public rights-of-way." City of Pasadena, Code of Ordinances § 32-99(b). With "unreasonable or unfeasible" being defined as "whether the requirement would subject the person or persons to . . . any other unreasonable technical or economic burden." *Id.* § 32-99(n).

Based on plain reading of the Design Manual, the spacing requirement for small node networks is clearly more burdensome than the requirements applicable to other users of the rights-of-ways found in the City's Code of Ordinances.[17] Additionally, the underground requirement in the Design Manual is more burdensome because it does not contain the same exceptions for technical infeasibility, and forces small cell network equipment underground even if doing is not feasible or reasonable given technological constraints.[18] Further, the fact these requirements are more burdensome and discriminatorily applied indicates these requirements are not a reasonable exercise of the City's power to manage its public rights-of way. *See In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*, 33 F.C.C. Rcd. at 9132. Thus, the

---

[17] For a full discussion on the spacing requirement, *see infra* D.1.c.i.

[18] For a full discussion on the underground requirement, *see infra* D.1.c.ii.

Court finds the Safe Harbor Provision does not apply here because the spacing and underground requirements at issue are discriminatory and are not reasonable exercises of the City's power to manage its public rights-of-way. Having decided the question of the applicability of the safe harbor provision, the Court now turns to whether the Design Manual's spacing and underground requirements are preempted by § 253(a) of the Act.

      *c.*     *Preemption Under 47 U.S.C. § 253(a)*

Crown Castle contends the Design Manual's spacing and underground requirements materially inhibit its ability to provide telecommunications services as the requirements are onerous and discriminatory and are thus preempted by Section 253(a) of the Act. The City contends: (1) Crown Castle cannot establish a violation of Section 253(a) because the spacing and underground requirements do not materially inhibit Crown Castle's ability to provide services; and (2) the Act does not apply to services related to the densification (i.e., increasing the capacity) of existing networks.

Congress enacted the Act "to provide for pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services by opening all telecommunications markets to competition." *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 493 (2d Cir. 1999) (alternations and internal

quotation marks omitted). Under the Act, "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). A state or local requirement would constitute an effective prohibition if the requirement "materially inhibits" the "critical deployments of Small Wireless Facilities and [the] nation's drive to deploy 5G." *In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*, 33 F.C.C. Rcd. at 9102–03. The Court now evaluates the novel issue of whether the Design Manual's spacing and underground requirements materially inhibit Crown Castle's ability to provide telecommunications services, starting with the spacing requirement.

      *i.*      *Spacing Requirement*

Crown Castle contends the spacing requirement, found in Sections 4.E.1 and 5.B of the Design Manual, is preempted by Section 253(a) because it materially inhibits Crown Castle's ability to provide telecommunications services: (1) by prohibiting construction of small cell node support poles in roughly 80% of the locations necessary to the network design; (2) because the City's proposed alternative of forced co-location of the nodes on CenterPoint utility poles would affect the efficacy of the network design and be an improper way for the City to control the means or facilities through with Crown Castle provides its services; and

(3) because it discriminates against small node networks in that the requirements are more onerous on small node networks than similar users of public rights-of-way. Conversely, the City contends: (1) Section 253(a) does not apply to municipal regulations impeding the densification of an existing network; and (2) the FCC's interpretation of the Act is "irrational, arbitrary, and capricious,"[19] which should dissuade the Court from applying it to the Design Manual.

Reasonable aesthetic requirements are those that are "technically feasible and reasonably directed to avoiding or remedying the intangible public harm of unsightly or out-of-character are also permissible." *Id.* However, a "discriminatory application [of aesthetic requirements] evidences [those] requirements are not, in fact, reasonable and directed at remedying the impact of wireless infrastructure deployment." *Id.* Further, a minimum spacing requirement may run afoul of the Act when it "has the effect of materially inhibiting wireless service" under Section 253(a). *In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*, 33 F.C.C. Rcd. at 9132.

The contested spacing requirement is found in two places in the Design Manual and both identically state: "New node support poles shall be at a minimum

_____

[19] While the City argues the FCC Order is arbitrary and capricious, it did not challenge the FCC Order when it was issued and does not challenge it now. Thus, the Court does not consider whether the FCC Order's pronouncement regarding aesthetic requirements is arbitrary and capricious at this time.

300 feet from a utility pole or another Node Support Pole to minimize the hazard of poles adjacent to road-ways and minimize effect on property values and aesthetics on the area."[20] Crown Castle contends this spacing requirement is not only discriminatory, as it only applies to new small node networks, but it is also not technically feasible. The purpose of the DAS network Crown Castle wishes to create is to densify, or enhance, T-Mobile's cellular network coverage in the City. The new DAS network Crown Castle seeks to implement requires the nodes to be placed at specific locations to function properly.[21] Further, the small network nodes must be installed at a specific height, between thirty-one and thirty-five feet.[22] Any node installed below or above this height would compromise the functionality and efficacy of the entire DAS network.[23] Crown Castle contends the spacing requirement has precluded the use of roughly 80% of its intended sites.[24] Meaning, there are only a handful of sites where Crown Castle could possibly install its

---

[20] *Plaintiff Crown Castle Fiber LLC's Motion for Summary Judgment*, Document No. 124, Exhibit 9 at 18, 21 (*Amended Design Manual*).

[21] *Plaintiff Crown Castle Fiber LLC's Motion for Summary Judgment*, Document No. 124, Exhibit 4A at 15, 35–39 (*Expert Report of Richard Conroy*).

[22] *Plaintiff Crown Castle Fiber LLC's Motion for Summary Judgment*, Document No. 124, Exhibit 4A at 16–17 (*Expert Report of Richard Conroy*).

[23] *Plaintiff Crown Castle Fiber LLC's Motion for Summary Judgment*, Document No. 124, Exhibit 4A at 16–17 (*Expert Report of Richard Conroy*).

[24] *Plaintiff Crown Castle Fiber LLC's Motion for Summary Judgment*, Document No. 124, Exhibit 4A at 32 (*Expert Report of Richard Conroy*).

nodes that would be within 300 feet of an existing utility pole, and this does not take into account whether these locations would be viable in Crown Castle's densification efforts.

In response, the City contends Section 253(a) does not apply to the densification of existing cellular networks, only the construction of new networks. However, the City overlooks the broad language of Section 253(a), which says "[n]o . . . local statute or regulation . . . may prohibit or have the effect of prohibiting the ability of any entity to provide *any* interstate or intrastate telecommunications service." 47 U.S.C. § 253(a) (emphasis added). Therefore, the Court finds Section 253(a) applies to Crown Castle's efforts to densify T-Mobile's network.

As alternatives to Crown Castle's noncomplying DAS network plan, the City proposed Crown Castle could either co-locate its small network nodes on existing CenterPoint utility poles or relocate the node to a conforming location. As to the forced co-location alternative—assuming CenterPoint consents—it would require the small network nodes be installed at roughly forty to fifty-five feet, much higher than the optimal, effective height for this technology.[25] And with respect to the relocation alternative, it overlooks the fact these small network nodes

---

[25] *Plaintiff Crown Castle Fiber LLC's Motion for Summary Judgment*, Document No. 124, Exhibit 4A at 22–23 (*Expert Report of Richard Conroy*).

must be placed in very specific locations to actually achieve their intended purpose. The fact an alternative exists does not negate the fact the Design Manual specifically targets the construction small cell networks. Notably, all other users of public rights-of-way are *not* subject the same spacing requirements despite the City's insistence the basis for the Design Manual's spacing requirement is to help visibility on rights-of-way as a matter of public safety.[26] All other users of the City's public rights-of-way are subject to the less stringent requirements found in the City's Code of Ordinances—which does not include a spacing requirement. *See* City of Pasadena, Code of Ordinances § 32-99. However, the fact this spacing requirement is discriminatorily applied to only small cell technology indicates the purpose of the requirement is not, in fact, public safety and if unreasonable. *See In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*, 33 F.C.C. Rcd. at 9132.

Given the discriminatory application of the Design Manual's spacing requirements in Sections 4.E.1 and 5.B to small cell networks, the Court finds the spacing requirement is not reasonable. The Court further finds the spacing requirement effectively prohibits the construction of small node networks by

---

[26] *Plaintiff Crown Castle Fiber LLC's Motion for Summary Judgment*, Document No. 124, Exhibit 1 at 83:5–16 (Q: "CenterPoint Energy is permitted to locate their poles closer than 300 feet apart in the [City] right-of-way; correct?"; A: "They operate under different rules.") (*Deposition of Zafar Iqbal*).

prohibiting construction of such nodes in large swaths of the City's public rights-of-ways. Because the Court finds the spacing requirement effectively prohibits the construction of small node networks, the Court further finds the spacing requirement effectively prohibits Crown Castle from providing telecommunications services. Thus, the Court finds the spacing requirement as found in the Design Manual is preempted by Section 253(a) of the Act. Accordingly, the Court grants Crown Castle's motion for summary judgment as to the spacing requirement, found in Sections 4.E.1 and 5.B of the Design Manual. Now the Court turns to whether the underground requirement is preempted by the Act.

ii.    *Underground Requirement*

Crown Castle contends the underground requirement, found in Sections 4.C.3 and 4.C.4 of the Design Manual, are preempted by Section 253 because it materially inhibits Crown Castle's ability to provide telecommunications services because this requirement is not technologically feasible. The City contends: (1) Section 253(a) does not apply to municipal regulations impeding the densification of an existing network; and (2) the underground requirement is a reasonable exercise of its right to manage public rights-of-ways based on aesthetics and safety concerns.

As with spacing requirements, the FCC Order also discusses whether an underground requirement would be preempted by the Act. With respect to underground requirements, "a requirement that *all* wireless facilities be deployed underground would amount to an effective prohibition given the propagation characteristics of wireless signals." *In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*, 33 F.C.C. Rcd. at 9133 (emphasis in original).

Here, the underground requirement reads in relevant part: "A Network Provider is prohibited from installing above ground on an existing pole a Network Node and related equipment in a public right-of-way in a residential area," and "all the equipment is required to be installed underground for the safety of the residents and the aesthetics of the area."[27] While all other users of the City's public rights-of-way are "may be required to place certain facilities within the public rights-of-way underground according to applicable city requirements . . . unless the person makes a compelling demonstration that . . . this requirement is not reasonable, feasible or equally applicable to other similar users of the public rights-of-way." City of Pasadena, Code of Ordinances § 32-99(b).

---

[27] *Plaintiff Crown Castle Fiber LLC's Motion for Summary Judgment*, Document No. 124, Exhibit 9 at 18, 21 (*Amended Design Manual*).

Crown Castle contends it is not feasible to force its small cell network nodes underground because it would effectively doom those nodes to failure. Crown Castle contends requiring these nodes to be buried underground would drastically reduce their efficacy, effectively prohibiting them from providing telecommunications services.[28] Crown Castle also notes—assuming it is technically feasible to bury the small cell equipment underground—the nodes would have to be sealed in without proper ventilation in a concrete box to prevent water intrusion because the City is prone to flooding.[29] This would cause then the node to overheat and cease to function.[30] Due to the nature of technology and practical considerations, Crown Castle contends it is not technically feasible to place its small network nodes underground. Crown Castle also notes its position is in accord with the FCC Order which states an underground requirement such as the one found in the Design Manual would "amount to an effective prohibition" on the ability to provide telecommunications services. *In the Matter of Accelerating*

---

[28] *Plaintiff Crown Castle Fiber LLC's Motion for Summary Judgment*, Document No. 124, Exhibit 4A at 33–35 (*Expert Report of Richard Conroy*).

[29] *Plaintiff Crown Castle Fiber LLC's Motion for Summary Judgment*, Document No. 124, Exhibit 4A at 33 (*Expert Report of Richard Conroy*); *Plaintiff Crown Castle Fiber LLC's Motion for Summary Judgment*, Document No. 124, Exhibit 3 at 131:6–132:8 (*Deposition of Richard Conroy*).

[30] *Plaintiff Crown Castle Fiber LLC's Motion for Summary Judgment*, Document No. 124, Exhibit 4A at 33 (*Expert Report of Richard Conroy*); *Plaintiff Crown Castle Fiber LLC's Motion for Summary Judgment*, Document No. 124, Exhibit 3 at 131:6–132:8 (*Deposition of Richard Conroy*).

*Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*, 33 F.C.C. Rcd. at 9133

The City first contends Section 253(a) does not apply here because Crown Castle seeks to densify an existing cellular network. However, as the Court found above, Section 253(a) applies to the densification of an existing cellular network.[31] The City also contends the underground requirement falls well within its right to manage its public rights-of-ways for safety and aesthetic concerns. However, the City, in both its response to Crown Castle's motion for summary judgment and its own motion for summary judgment, fails to acknowledge the technical impracticality of forcing small cell nodes and their equipment underground. Nor does the City acknowledge the discrepancy between the underground requirement in the Design Manual and the underground requirement in its Code of Ordinances. At least in the Code of Ordinances, if a party can make a showing that the requirement is not technically feasible, the party can be excepted from complying with the underground requirement. *See* City of Pasadena, Code of Ordinances § 32-99(b). There is no such process under the Design Manual. In light of this unexplained discrepancy in treatment, the Court finds the underground requirement found in Sections 4.C.3 and 4.C.4 of the Design Manual is not a reasonable exercise of the City's right to manage its public rights-of-way.

---

[31] *See* discussion *supra* D.1.c.i.

Therefore, the Court finds the underground requirement effectively prohibits the construction of small cell nodes because it is not feasible to place such nodes underground due to both technological and practical considerations. Because the Court finds the underground requirement effectively prohibits the construction of small cell networks, the Court further finds the underground requirement effectively prohibits Crown Castle from providing telecommunications services. Thus, the Court finds the underground requirement as found in the Design Manual is preempted by § 253(a) of the Act. Therefore, the Court grants Crown Castle's motion for summary judgment as to the underground requirement found in Sections 4.C.3 and 4.C.4 of the Design Manual. Accordingly, Crown Castle's motion for summary judgment as to Crown Castle's preemption claim based on 47 U.S.C. § 253(a) is granted.

2.    *Preemption Under Texas Local Government Code § 284*

Crown Castle contends the Design Manual's spacing and underground requirements are also preempted by Chapter 284 of the Texas Local Government Code. The City contends it complied with the requirements set by Chapter 284, thus Crown Castle's claim fails. However, the Court need not reach this issue given the Court's ruling above, finding the Design Manual is preempted by Section 253(a) of the Act.

### 3.    *Injunctive Relief*

Crown Castle contends it is entitled to injunctive relief because: (1) it can show success on the merits; (2) it can show a threat of immediate and irreparable harm; (3) the harm to Crown Castle outweighs the harm to the City if a permanent injunction is issued; and (4) a permanent injunction would serve the public interest in this case, given Crown Castle seeks to increase telecommunications services offered to the public.

The elements of a permanent injunction are nearly identical to those of a preliminary injunction, except that a "plaintiff must show actual success on the merits rather than a mere likelihood of success." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987). Thus, to establish it is entitled to a permanent injunction, a plaintiff must demonstrate: (1) an actual success on the merits; (2) a substantial threat of immediate and irreparable harm for which it has no adequate remedy at law; (3) that greater injury will result from denying the [injunction] than from its being granted; and (4) that an injunction will not disserve the public interest. *Clark v. Prichard*, 812 F.3d 991, 993 (5th Cir. 1985); *Amoco Prod.*, 480 U.S. at 546 n.12. The decision whether to grant or deny a permanent injunction is within a court's discretion. *See Lemon v. Kurtzman*, 411 U.S. 192, 200–01 (1973). A permanent injunction "is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries

the burden of persuasion." *Holland Am. Ins. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). However, even if the movant establishes all the required elements for a permanent injunction, it still remains within the court's discretion to either grant or deny such relief. *Lemon*, 411 U.S. at 200–01.

Here, the first element has been established as Crown Castle succeeded on the merits of its claims that the spacing and underground requirements are preempted by the Act.

As for the second element, Crown Castle contends it will suffer, and has suffered, immediate and irreparable harm as the spacing and underground requirements preventing it from building the DAS network in the City. The City fails to show Crown Castle would not suffer such harm if an injunction does not issue. Thus, the Court finds Crown Castle would suffer immediate and irreparable harm in the absence of a permanent injunction.

With respect to the third element, Crown Castle contends it would suffer a greater harm from the denial of a permanent injunction than the City would suffer if one were granted in this case. Indeed, Crown Castle would be prevented from implementing the DAS network pursuant to its agreement with T-Mobile, affecting the quality of telecommunications services provided to the public. The City fails to show the harm from its inability to enforce the spacing and underground requirement outweighs the harm to Crown Castle if it is unable to implement the

DAS network. Therefore, the Court finds the harm in denying a permanent injunction outweighs the harm in granting one.

Finally, Crown Castle contends a permanent injunction in this case would actually benefit the public, as its goal in building the DAS network with T-Mobile is enhance cellular network coverage *available to the public*. The City does not argue, and consequently fails to show, the public would be disserved by a permanent injunction in this case. Thus, the Court finds the issuance of a permanent injunction in this case would not disserve the public interest. Therefore, the Court finds Crown Castle established it is entitled to the entry of a permanent injunction, enjoining the enforcement of Sections 4.C.3, 4.C.4, 4.E.1, and 5.B of the Design Manual.

E.   *The City's Motion for Summary Judgment*

The City contends it is entitled to summary judgment because its conduct falls within the Safe Harbor Provision which preserves a municipality's power to manage its rights-of-way. In light of the Court's ruling above, the Court determines the City's motion for summary judgment should be denied for the reasons set forth above. Accordingly, the City's motion for summary judgment is denied.

F.   *Crown Castle's Motion for Judgment on the Pleadings*

Crown Castle contends judgment on the pleadings is proper because the City has not yet filed an answer, and thus the City has procedurally admitted to all of

Crown Castle's allegations in its amended complaint. The City, in response, moved for leave to file an answer.[32] In light of the Court's ruling above, the Court determines the motion for judgment on the pleadings should be denied as moot. Accordingly, Crown Castle's motion for judgment on the pleadings is denied as moot.

## IV.  CONCLUSION

Based on the foregoing, the Court hereby

**ORDERS** that Plaintiff Crown Castle Fiber LLC's Motion for Judgment on the Pleadings (Document No. 123) is **DENIED**.  The Court further

**ORDERS** that Defendant City of Pasadena's Motion to Dismiss and for Final Summary Judgment (Document No. 128) is **DENIED**. The Court further

**ORDERS** that Defendant City of Pasadena's Combined Opposition to Plaintiff's Motion for Judgment on the Pleadings and the City's Opposed Motion for Leave to File a Responsive Pleading (Document No. 134) is **DENIED AS MOOT**. The Court further

**ORDERS** that Plaintiff Crown Castle Fiber LLC's evidentiary objections to Defendant City of Pasadena's summary judgment evidence are **OVERRULED**. The Court further

---

[32] *See* discussion *supra* B.1 and B.2.

**ORDERS** that Plaintiff Crown Castle Fiber LLC's Motion for Summary Judgment (Document No. 124) is **GRANTED**. The Court further

**ORDERS** that Defendant the City of Pasadena is **PERMANENTLY ENJOINED** from enforcing Sections 4.C.3, 4.C.4, 4.E.1, and 5.B of its Design Manual as to Plaintiff Crown Castle Fiber LLC for the purposes of installing new small nodes and node support poles in public rights-of-ways. The Court will enter a separate final judgment.

SIGNED at Houston, Texas, on this __2__ day of August, 2022.

DAVID HITTNER
United States District Judge